**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

**Case No. 25-cv-04102**

**SECURITIES AND EXCHANGE COMMISSION,**

Plaintiff,

**v.**

**MOROCOIN TECH CORP.,**
**BERGE BLOCKCHAIN TECHNOLOGY CO., LTD.,**
**CIRKOR INC.,**
**AI WEALTH INC.,**
**LANE WEALTH INC.,**
**AI INVESTMENT EDUCATION FOUNDATION LTD., and**
**ZENITH ASSET TECH FOUNDATION,**

Defendants.

---

**COMPLAINT AND JURY TRIAL DEMAND**

---

Plaintiff Securities and Exchange Commission (the "Commission") files this Complaint against defendants Morocoin Tech Corp. ("Morocoin"), Berge Blockchain Technology Co., Ltd. ("Berge"), Cirkor Inc. ("Cirkor"), AI Wealth Inc. ("AI Wealth"), Lane Wealth Inc. ("Lane Wealth"), AI Investment Education Foundation Ltd. ("AIIEF"), and Zenith Asset Tech Foundation ("Zenith" and, collectively, "Defendants") and alleges as follows:

**SUMMARY**

1.      This case involves an investment confidence scam in which Defendants lured retail investors to purported crypto asset trading platforms claiming to hold regulatory licenses, including from the Commission; gained investors' confidence with purportedly AI-generated investment "signals," or tips; manipulated investors into investing in fictitious "Security Token

Offerings" ("STOs"); and caused investors to pay fraudulent withdrawal fees by telling them their accounts would be frozen.

2.    AI Wealth, Lane Wealth, AIIEF, and Zenith (collectively, the "Club Defendants") operated so-called investment clubs that were WhatsApp chats purportedly run by experienced financial professionals who gave purported investment recommendations to investors. Agents acting on behalf of the Club Defendants solicited U.S.-based investors for the investment clubs through social media ads.

3.    After establishing trust with their victims, the Club Defendants recommended that the victims trade crypto assets and directed them to open accounts on the purported crypto asset trading platforms operated by Morocoin, Berge, and Cirkor (collectively, the "Platform Defendants"). The Club Defendants and Platform Defendants then offered "Security Token Offerings" or "STOs" purportedly issued by legitimate businesses and expressly equated the STOs to initial public offerings of stock.

4.    Investors could log into their accounts on the platforms and those accounts reflected purported trading profits and losses. But Morocoin, Berge, and Cirkor were not genuine trading platforms, and no trading took place on those platforms. Indeed, both the STOs and their purported issuing companies were fictitious.

5.    This was an elaborate confidence scam through which investors' assets were never invested as Defendants represented they would be but instead were misappropriated from the start. Defendants further defrauded victims who attempted to withdraw money by demanding that they pay advance fees in order to gain access to any purported funds in their accounts.

2

6.      All told, from at least January 2024 to January 2025, Defendants acted in concert to misappropriate at least $14 million from U.S.-based retail investors, which was then funneled overseas through a web of bank accounts and crypto asset wallets.

7.      By engaging in the conduct described in this Complaint, the Platform Defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and the Club Defendants violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

8.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin such acts, transactions, practices, and courses of business and to obtain disgorgement and prejudgment interest against the Platform Defendants, civil money penalties, and such other and further relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.     Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Morocoin, Berge,

3

AIIEF, and Zenith all reside in the District of Colorado, and certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this district.

**DEFENDANTS**

11.     **Morocoin Tech Corp.**, established in or about December 2023, is a Colorado corporation in "Delinquent" status purportedly headquartered in Denver, Colorado.  Morocoin has never been registered with the Commission and never had a class of securities registered with the Commission.  Morocoin operated a purported crypto asset trading platform using the website h5.morocoin.top.

12.     **Berge Blockchain Technology Co., Ltd.**, established in or about June 2022, is a Colorado corporation in "Delinquent" status purportedly headquartered in Colorado Springs, Colorado.  Berge has never been registered with the Commission and never had a class of securities registered with the Commission.  Berge operated a purported crypto asset trading platform using the website www.bergev.org.

13.     **Cirkor Inc.**, established in or about May 2024, is a Washington corporation purportedly headquartered in Spokane, Washington.  Cirkor was administratively dissolved in October 2025.  Cirkor has never been registered with the Commission and never had a class of securities registered with the Commission.  Cirkor operated a purported crypto asset trading platform using the website www.cirkortrading.com.

14.     **AI Wealth Inc.**, established in or about December 2023, is a Washington corporation purportedly headquartered in Seattle, Washington.  AI Wealth was administratively dissolved in May 2025.  AI Wealth has never been registered with the Commission and never

4

had a class of securities registered with the Commission.  AI Wealth operated a purported investment club that communicated with investors using WhatsApp.

15.     **Lane Wealth Inc.**, established in or about December 2023, is a Washington corporation purportedly headquartered in Seattle, Washington.  Lane Wealth was administratively dissolved in May 2025.  Lane Wealth has never been registered with the Commission and never had a class of securities registered with the Commission.  Lane Wealth operated a purported investment club that communicated with investors using WhatsApp.

16.     **AI Investment Education Foundation Ltd.**, established in or about June 2024, is a Colorado corporation in "Delinquent" status purportedly headquartered in Denver, Colorado. AIIEF operated a purported investment club that communicated with investors using WhatsApp. On June 27, 2024, AIIEF filed a Form ADV with the Commission as an Exempt Reporting Adviser.  In November 2025, the Commission filed a complaint against AIIEF alleging that AIIEF made material misrepresentations and statements that could not be substantiated in its June 27, 2024 Form ADV in violation of Sections 204(a) and 207 of the Investment Advisers Act of 1940 [15 U.S.C. §§ 80b-4(a), 80b-7].  *See SEC v. AI Investment Education Foundation Ltd.*, No. 1:25-cv-03650-SKC (D. Colo. filed Nov. 13, 2025).

17.     **Zenith Asset Tech Foundation**, established in or about May 2024, is a Colorado corporation in "Delinquent" status purportedly headquartered in Lakewood, Colorado.  Zenith has never been registered with the Commission and never had a class of securities registered with the Commission.  Zenith operated a purported investment club that communicated with investors using WhatsApp.

5

## FACTS

### The Club Defendants Solicited Investors to Join Clubs
### Promising Trading Profits from AI-Generated "Signals"

18.    Beginning in or around January 2024, agents acting on behalf of the Club Defendants solicited U.S.-based investors through social media ads to join each respective investment club—which were essentially no more than WhatsApp groups that provided purported investment recommendations from purportedly experienced financial professionals. Some of the social media ads featured deepfake videos of prominent financial professionals.

19.    AI Wealth and Lane Wealth operated their clubs through their respective WhatsApp groups from at least January 2024 to June 2024.

20.    AIIEF and Zenith operated their clubs through their respective WhatsApp groups from at least July 2024 to January 2025.

21.    According to corporate registration records, the same individual located in Beijing, China, paid for the registrations of AI Wealth, Lane Wealth, and Zenith.

22.    The Club Defendants had similar operations.

23.    At all times, each of the Club Defendants acted by and through its agents.

24.    This included, for each club, a purported "professor" who sent updates to investors via WhatsApp on macroeconomic conditions or commentary on stocks and an "assistant" who handled day-to-day interactions with participants.

25.    The professors and assistants who led the clubs also sent via WhatsApp trade recommendations that they falsely claimed were based on AI-generated "signals."

26.    Some participants in the investment clubs posted screenshots of purportedly successful trades, praising the accuracy of the trading signals.  At least some of the screenshots

6

of these purportedly successful trades appear to have been posted by scheme participants as a part of the scheme.

**The Club Defendants Directed Investors to
Trade Crypto Assets on the Platform Defendants**

27.    As the next step in the scheme, Club Defendants promoted crypto asset trading and directed the victims to open accounts on the crypto asset trading platforms of Morocoin, Berge, and Cirkor.  The accountholders of internet services used by these platforms were located in China and Malaysia.

28.    Professors and assistants in the AI Wealth and Lane Wealth clubs directed investors to the Morocoin platform.

29.    The professor and assistant in the AIIEF club directed investors to the Berge platform.

30.    The professor and assistant in the Zenith club directed investors to the Cirkor platform.

31.    At all times, each of the Platform Defendants acted by and through its agents.

32.    The websites of the purported trading platforms shared common attributes.  For example, both Morocoin and Cirkor billed themselves as the "World's First Stablecoin Trading Center" offering "Impeccable Security" and "24/7 Multilingual Customer Service," and provided the same informational articles about crypto assets.

33.    Each platform also provided investors with an interface that mimicked the features and functionality of a legitimate crypto asset trading platform, including displaying real-time price information for various crypto assets, facilitating purported transactions, and posting investor account balances.

## Defendants Made False Claims About the
## Platforms' Regulatory Registrations and Security Features

34.     Defendants advertised the Platform Defendants' corporate and regulatory registrations and supposed security features.

35.     In particular, Defendants made claims about the platforms' Financial Crimes Enforcement Network ("FinCEN") Money Services Business ("MSB") registrations, and regulatory licenses obtained from the Commission and the National Futures Association ("NFA").

36.     For example, the AI Wealth professor represented that he trusted Morocoin because it held "both MSB/NFA licenses" which were "the most compliant and currently the most effective assurance in the U.S. regulation of the crypto field."

37.     Cirkor's website stated that it "obtained dual MSB licenses from the United States and Canada" and claimed that it had "regulatory licenses from the U.S. NFA and SEC."

38.     A Berge agent purporting to work in the company's customer service department sent some investors Berge's MSB registration and Colorado corporate registration.

39.     In reality, the Platform Defendants did not hold Commission or NFA licenses, and their MSB and corporate registrations did not mean that they were compliant or legitimate.

40.     The Platform Defendants' statements regarding their regulatory licenses were important to the victims of this fraud because they seemed to provide legitimacy and credibility to the platforms.

41.     As to security measures, Morocoin's and Cirkor's websites used nearly identical language representing they had "Impeccable Security" using "cutting-edge" or "advanced Ledger Vault technology" while claiming to have "$150 million in insurance against third-party theft, insider collusion, and master seed theft."

8

42. Berge's website represented that it had "state-of-the-art security measures" and "[s]trictly follow[s] industry rules."

43. These statements about the platforms' security features were untrue because they did not exist and gave investors the false impression that any funds they deposited into the platforms would be safe.

Morocoin, Berge, and Cirkor Were Not Genuine Trading
Platforms, and Trading Never Actually Took Place on Them

44. Once investors opened purported trading accounts on each platform, they were directed by representatives of the platforms to fund their accounts with either fiat currency or crypto assets.

45. The Platform Defendants directed investors who used fiat currency to fund their purported accounts by wiring the money to designated bank accounts or arranged a courier to pick up the money in person.

46. The Platform Defendants told investors that the recipient bank account holders were "merchants" or "dealers" affiliated with the Platform Defendants that would convert the wired fiat currency into crypto assets to be credited to an investor's individual platform account.

47. For investors who wanted to use crypto assets to fund their purported accounts, the Platform Defendants directed investors to transfer those assets to unhosted deposit wallets generated by each platform.

48. Unhosted wallets are crypto asset wallets that are not managed or held on a third-party platform or exchange. Fraudsters may use unhosted wallets to operate investment confidence schemes like this one because, among other reasons, they do not require attribution or know-your-customer verification by a platform or exchange.

9

49.    After investors sent their funds as directed by the Platform Defendants, an equivalent amount appeared in each investor's purported trading account on the platform.

50.    Investors could then purportedly trade crypto assets as directed by the Club Defendants' professors and assistants.

51.    The Platform Defendants posted purported trading profits and losses in the investors' accounts, as if the platforms were, in fact, genuine trading platforms.  They were not. Trading never actually took place on the platforms.

52.    The purported crypto assets investors supposedly were trading did not exist outside of their use in this scheme.

53.    Defendants knew or were reckless in not knowing that the trading on the platforms was fake.

### Defendants Promoted and Offered Fake STOs

54.    Whether investors made or lost money in the purported trading, the professors and assistants acting on behalf of the Club Defendants and agents of the Platform Defendants promoted fake "Security Token Offerings" or "STOs" of new crypto assets available on the platforms.

55.    Defendants knew or were reckless in not knowing that the STOs were fake.

56.    The Club Defendants and Platform Defendants promoted STOs purportedly issued by legitimate businesses and equated them to initial public offerings of stock.

57.    Defendants represented that the STOs were the best way investors could either earn greater profits or make back losses.

58.    For example, the AI Wealth professor told investors in connection with one of the STOs that they were "akin to IPOs in the stock primary market. The only difference is that one

10

involves the initial public offering of new stocks, while the other involves the initial offering of new coins!"

59. In some cases, based on the direction of the Club Defendants, investors used the balance of their trading accounts to participate in the purported STO. Many investors deposited additional funds and/or took out purported loans to increase their STO investments.

60. Investors' funding their accounts to participate in the STOs and their payment of advance fees led to the majority of the losses in this scheme.

## NNET

61. Beginning in May 2024, professors and assistants in the AI Wealth and Lane Wealth WhatsApp groups, and scheme participants acting as agents on behalf of Morocoin, promoted an STO of a crypto asset called NNET purportedly issued by a company called NeuralNet.

62. They directed investors to a now-defunct website that represented that NeuralNet was developing a "brain-computer interface and humanoid robot technology" and would "combine[] advanced neuroscience, artificial intelligence and robotics" to "create an efficient and intelligent way of human-computer interaction to improve people's quality of life and promote scientific and technological progress."

63. This information was fake. NeuralNet never existed as a real company.

64. Notwithstanding this, the website represented that 55% of all minted NNET tokens would be held to support the company's liquidity, treasury, marketing, and operations functions, and touted the project's "strong team of experts" in "artificial intelligence, machine learning, brain-computer interface, robotics and other fields."

11

65. The website represented that the remainder of NNET tokens would be sold in the STO.

66. The NNET tokens were offered and sold subject to an investment contract.

67. Purchasing NNET tokens involved the investment of money in the form of fiat currency or crypto assets.

68. By investing in NNET tokens, victims of the fraud were investing in a common enterprise.

69. AI Wealth and Lane Wealth promoted NNET's profit potential to their investment club participants.

70. The AI Wealth professor stated that NNET would attract "global investors" and linked that attention to the company's business potential: "Why is [NNET] so hot? Because of market demand, the brain-computer interface has been officially able to unrestrictedly help humans successfully recover from complex diseases.  Coupled with advancements in technology and the deepening integration of AI technology, these applications are not only limited to the medical field but also extend to education, the transmission of human civilization, and even the potential to transcend humanity into space."

71. The AI Wealth professor further represented that NeuralNet's management had a "willingness to share profits," which "demonstrate[ed] that the team is mission-driven, viewing brain-machine interface technology research as a responsibility."

72. According to the AI Wealth professor, NNET had "a 0 risk advantage and 100% explosive profits!," so investors should "go ALL IN on the subscription."

73. Similarly, the Lane Wealth assistant represented that "[i]t only takes one week to increase your funds by at least 500%" by investing in NNET.

74.     The victims accordingly invested based on the expectation of profits produced by the efforts of others.

75.     One Morocoin investor reported purchasing NNET tokens at $2 per token and saw the price purportedly increase to over $16 per token in his Morocoin account.  After the STO purportedly occurred, the investor believed that he had made approximately $133,300.

76.     Another Morocoin investor reported depositing $50,000 into his Morocoin account via cash picked up by an unknown courier affiliated with Morocoin, which he used to invest in the NNET STO.  After the STO purportedly occurred, the investor believed that he had made approximately $300,000.

77.     NeuralNet and NNET were both fictitious, and the profits that victims thought they had obtained from NNET's STO were not real.

78.     Defendants knew or were reckless in not knowing that NeuralNet and NNET were both fictitious.

SCT

79.     In late May and June 2024, professors and assistants in the AI Wealth and Lane Wealth WhatsApp groups, and scheme participants acting as agents on behalf of Morocoin, promoted an STO of a crypto asset called SCT purportedly issued by the company SatCommTech.

80.     Defendants directed investors to a now-defunct website that represented that SatCommTech's "core goal" was "to build a secure, reliable and efficient decentralized communication network" using "blockchain technology and low-orbit satellites" to "significantly improve[] the security, stability and efficiency of communication."

13

81.     The website listed the benefits of SatCommTech's "innovative solution," including improved data storage and energy optimization, and boasted that SatCommTech would "usher in a new era of communication."

82.     The website further represented that SatCommTech's management team "consist[ed] of a group of people with rich experience and expertise in the field of communication technology" who were "committed to promoting the innovation and development of SatCommTech, providing investors with efficient and reliable communication services."

83.     This information was fake.  SatCommTech never existed as a real company.

84.     Notwithstanding this, the website and the AI Wealth professor represented that SatCommTech would retain 85% of minted SCT tokens for "Liquidity," "Marketing fee," "Mining incentive," and "Operations team."  The other 15% would be sold in the STO.

85.     The SCT tokens were offered and sold subject to an investment contract.

86.     Purchasing SCT tokens involved the investment of money in the form of fiat currency or crypto assets.

87.     By investing in SCT tokens, victims of the fraud were investing in a common enterprise.

88.     The AI Wealth professor represented that the SCT offering "was the closest issuance method to a stock IPO," that his purported artificial intelligence program valued SatCommTech at $20 billion, which would give investors at least 20x returns from this "0 risk project," and that it was "a high-quality project gaining the attention of global crypto players [that] will drive the project to achieve higher valuations."

14

89.     The Lane Wealth assistant similarly told investors to expect "at least [a] 20 times" return on their SCT investment.

90.     The victims accordingly invested based on the expectation of profits produced by the efforts of others.

91.     Some investors took out purported loans through Morocoin, with the respective clubs acting as purported guarantors on the loans.

92.     These loans, however, were not real in the sense that money was not actually loaned to investors.  Rather, they were a means to defraud investors at a later date by requiring investors to repay the purportedly borrowed money to withdraw funds from their platform accounts.

93.     For example, the AI Wealth assistant told one investor he should invest at least $1 million in the SCT STO.

94.     The investor believed he had borrowed 214,619 USDT (Tether) through Morocoin in order to make a sizable investment in the SCT STO, although that loan was not real.

95.     That investor understood that his $1 million investment grew to approximately $28 million.

96.     Similarly, another investor believed he borrowed 50,000 USDT through a fake loan through Morocoin, and supposedly made approximately $874,000.

97.     SatCommTech and SCT were both fictitious, and the profits that victims thought they had obtained from SCT's purported STO were not real.

98.     Defendants knew or were reckless in not knowing that SatCommTech and SCT were both fictitious.

15

<u>HMB</u>

99.    In December 2024, the professors and assistants in the AIIEF and Zenith WhatsApp groups, and scheme participants acting as agents on behalf of Berge and Cirkor, promoted an STO of a crypto asset called HMB purportedly issued by another fictitious company, HumanBlock.

100.    They directed investors to a now-defunct website that represented that HumanBlock was "develop[ing] a sophisticated humanoid robot platform that leverages the decentralized, secure, and transparent nature of blockchain technology."

101.    The website represented that HumanBlock's management team had "years of experience in the robotics and automatic industry" and "a proven track record of building scalable and secure distributed systems."

102.    An HMB whitepaper made available to investors by Cirkor, Berge, and Zenith (through the club assistant) laid out the supposed "Roadmap" for the "successful implementation of the HumanBlock Project."  The "Roadmap" included the "development and deployment of the robust blockchain architecture that will power the humanoid robots," "design and prototyping of the humanoid robot hardware," "deployment of the blockchain-powered humanoid robots in selected real-world settings," and finally, "scalable commercialization and expansion."

103.    This information was fake.  HumanBlock never existed as a real company.

104.    Notwithstanding this, the whitepaper further represented that 30% of the minted HMB tokens would be sold in the STO, 15% would be retained by the company, and 40% allocated to "whale institution locked-in."

105.    While the HMB whitepaper indicated that the HMB tokens could eventually be used, among other things, to purchase robots and pay for their maintenance, the professors and assistants encouraged the investments because of the profit potential from business growth.

106.    The HMB tokens were offered and sold subject to an investment contract.

107.    Purchasing HMB tokens involved the investment of money in the form of fiat currency or crypto assets.

108.    By investing in HMB tokens, victims of the fraud were investing in a common enterprise.

109.    The Zenith professor compared the offering to an IPO: "A new token offering is quite similar to a new stock issuance—STOs for tokens and IPOs for stocks."

110.    The Zenith professor represented that "based on the current market valuation and projected profit potential, we're looking at over 2,000% growth potential," and that "[i]t could very well define the most glorious moment of your financial life."

111.    The Zenith assistant represented that "[t]his new token has tremendous innovation and value-creation potential, serving as both a tool for asset growth and a strategic opportunity in an important future market."

112.    The AIIEF professor told investors the value of the HMB token "could yield at least dozens of times in returns."

113.    The victims accordingly invested based on the expectation of profits produced by the efforts of others.

114.    Investors also borrowed heavily to participate in the HMB STO.

17

115. For example, one investor reported that she paid $18,900 in cash (picked up in person by an unknown courier), wired $97,000 to a separate entity, and purportedly took a $800,000 loan through Cirkor, with AIIEF acting as purported guarantor on the loan.

116. This investor thought she had made more than $25 million from her investment.

117. HumanBlock and HMB were both fictitious, and the profits that victims thought they had obtained from HMB's STO were not real.

118. Defendants knew or were reckless in not knowing that HumanBlock and HMB were both fictitious.

### Defendants Increased Investor Losses by Charging Fees for Withdrawals They Never Granted

119. Following the purported success of their STO investments, Defendants charged investors who attempted to withdraw their trading profits advance fees that caused the investors further losses.

120. Advance fees are a type of fraud where the fraudster asks investors to pay a fee up front—in advance of receiving any proceeds or money—in order for the deal (in this case, the account withdrawal) to go through.

121. The advance fees Defendants charged investors took different forms.

122. The Platform Defendants told investors who had taken out purported loans to fund their investments that the investors had to repay the loans with money from outside their trading accounts before being able to make a withdrawal from their trading accounts.

123. Club Defendants added to the pressure on investors to repay the purported loans in order to make a withdrawal from their trading accounts.

18

124.    For example, the AI Wealth professor told investors that repaying their loans was a "credit protection battle for yourself" and "a battle to protect the reputation and value of the Wealth Club itself!"

125.    The Zenith professor told investors that "it's crucial for you to repay your loans" because not doing so could "potentially trigger a significant drop in token prices."

126.    The Lane Wealth assistant told investors that because Lane Wealth was the guarantor on the purported loans, "[i]f everyone doesn't repay the loans, the LANE club will face a broken capital chain and go bankrupt."

127.    In an attempt to make a withdrawal from their trading accounts, certain investors repaid their purported loans, including by transferring money directly to overseas accounts or by arranging a courier to pick up cash.

128.    Investors who repaid these purported loans still were not permitted by Defendants to withdraw any funds.

129.    Defendants also solicited fraudulent advance fees based on claims of fictitious government investigations.

130.    For example, in June 2024, Morocoin represented to investors that it was under investigation by the "MSB regulatory authority" and the Commission, which would "result in the freezing of all user account funds, with an estimated review period of three years."

131.    In order to avoid investors' funds being frozen, the announcement urged investors to "withdraw all assets" within ten days.

132.    AI Wealth, Lane Wealth, and Morocoin represented that withdrawal requests could be expedited by paying additional fees using money from outside investors' trading accounts.

133.    Likewise, in January 2025, both Berge and Cirkor posted similar notices that the "SEC has initiated a formal investigation," which "will freeze all user account funds during the review process, which is expected to last approximately three years."

134.    Berge and Cirkor also offered a ten-day window for investors to withdraw their funds.

135.    AIIEF, Zenith, Berge, and Cirkor told investors that they could expedite their withdrawals by paying fees using money from outside their trading accounts.

136.    As with the loans, certain investors paid the fees, but none was able to withdraw their money.

137.    Eventually, the Platform Defendants cut off investors from the platforms.

138.    Defendants used the purported loan repayments and false reports of government investigations as a continuation of their fraudulent scheme to obtain additional ill-gotten gains from their victims.

**Defendants Misappropriated Investor Funds**

139.    This was an elaborate confidence scam to misappropriate as much in crypto assets and fiat currency as Defendants could from their victims.

140.    No trading occurred on the Morocoin, Berge, or Cirkor platforms, and the STOs and their issuing companies never existed.

141.    The trading profits investors thought they earned were fictitious, and their original investment amounts were long since transferred overseas.

<u>Misappropriation of Crypto Assets</u>

142.    After investors transferred their crypto assets to the unhosted wallet addresses provided by the agents of the Platform Defendants, scheme participants transferred these assets

across blockchains and through intermediaries, in some instances transiting to or through common wallet addresses.

143. Certain funds transited through accounts held by Chinese or Burmese individuals located in southeast Asia.

144. Crypto asset wallet addresses that directly or indirectly received ill-gotten gains as part of this fraudulent scheme include:

    a. 0x250ceeb180bda7ba4103932b9d6b5bec7dbc3bc5;

    b. 0x27dff9fb7b488a7640b2f22cd0d2d07df8ae3580;

    c. 0x2748c2351ce1c9e05b33e51aa2a6a96aa14da13d;

    d. 0x4c581bb153ee80357d6855604313710f427e2b5d;

    e. 0x58601b1867d8c1bb4dfc1cf496e75fd2372f3ea3;

    f. 0xeba1802e75728523f4e7b9dc043f17aa66fd272e;

    g. 3G7vKuyFtB7FaAsRgQ3Rx75WUTNfKof3Tm;

    h. 14kddwrnCdaz4tSxCkn1XtXG3ST4MvczC5;

    i. 3EReBVf3QjsHF62VjBT5zW98dZFdtxUVuS;

    j. 1CgCmRRt45pLbiG83VR18geAd9S1QkdQoe;

    k. TWzhiLLQ5FEkMoxrfoVGJsEje8eFpDZYhE;

    l. TGvTXEvK79FSc8TiB3kQjGhK6yx7t8PAUG;

    m. TG4aYwQSqyRbYjhZ3Swdyo593zK2JvdWjC;

    n. TE66rxV58jix5a6PamjPYjs9L4R71fEkvi; and

    o. TKSpYzakT5PYCUbzFCYEU1gCZzSbS92wU4.

145.    The following chart summarizes the losses of U.S.-based investors identified to date in crypto assets used to fund their purported trading accounts and pay associated advance fees:

| Defendant Pairings | Investors | Traced Crypto Asset Losses |
|---|---|---|
| Morocoin | 27 | $5,520,032 |
| *AI Wealth Subtotal* | *14* | *$2,990,414* |
| *Lane Wealth Subtotal* | *13* | *$2,529,618* |
| Berge and AIIEF | 9 | $254,729 |
| Cirkor and Zenith | 21 | $1,632,376 |
| **Total** | **57** | **$7,407,137** |

Misappropriation of Fiat Currency

146.    Investors who used fiat currency to fund their purported accounts wired the money to bank accounts specified by Platform Defendants' representatives or had a courier pick up the money in person.

147.    The Platform Defendants, or those acting in concert with them, used at least 27 domestic bank accounts to receive, consolidate, and move money from Morocoin, Berge, and Cirkor investors.

148.    As with the crypto asset wallets, investor money was transferred through overlapping accounts.

149.    Investor money associated with Morocoin, Berge, and Cirkor, for instance, flowed through the same bank account.

150.    Certain investors wired money directly overseas.

151.    For example, one Morocoin investor made seven separate wires totaling more than $1 million to accounts in China and Hong Kong.

152.    In another example, a Cirkor investor wired over $1.4 million to a bank in Indonesia.

153.    The following chart summarizes the losses of U.S.-based investors identified to date in fiat currency used to fund their purported trading accounts and pay associated advance fees:

| Defendant Pairings | Investors | Traced Fiat Losses |
|---|---|---|
| Morocoin | 12 | $4,120,319 |
| *AI Wealth Subtotal* | *10* | *$3,593,919* |
| *Lane Wealth Subtotal* | *2* | *$526,400* |
| Berge and AIIEF | 4 | $426,000 |
| Cirkor and Zenith | 10 | $2,087,256 |
| **Total** | **26** | **$6,633,575** |

**Defendants Violated the Federal Securities Laws**

154.    Investors provided the Platform Defendants with money—from at least January 2024 to January 2025, the Platform Defendants received at least $14 million from U.S.-based retail investors, all of which the Platform Defendants then misappropriated.

155.    The investments in NNET, SCT, and HMB were offered and sold subject to investment contracts and therefore are securities within the meaning of the Securities Act and Exchange Act.

156.    The investments were each offered and sold by Defendants as a common enterprise with the expectation of profits to be derived from the efforts of others.

157.    Investors played no role in the management or operations of the businesses of NeuralNet, SatCommTech, and HumanBlock.

158.    Investors made their investments in the NNET STO with a reasonable expectation of profits to be derived from the efforts of others.

23

159. Investors made their investments in the SCT STO with a reasonable expectation of profits to be derived from the efforts of others.

160. Investors made their investments in the HMB STO with a reasonable expectation of profits to be derived from the efforts of others.

161. Defendants engaged in the offer and sale of the securities by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

162. Defendants, directly or indirectly, made materially false and misleading statements and omissions and engaged in deceptive conduct concerning, among other things: (1) the regulatory registrations and security features of the platforms, (2) the respective businesses of NeuralNet, SatCommTech, and HumanBlock; (3) the STOs of the NNET, SCT, and HMB tokens; (4) the purported loans extended by the Platform Defendants to investors; and (5) the advance fees charged for investors to obtain access to their purported investment gains from the STOs.

163. The Club Defendants, directly or indirectly, also made materially false and misleading statements and omissions and engaged in deceptive conduct concerning, among other things: (1) their provision of investment advice by financial professionals; (2) the legitimacy of the platforms; and (3) the existence of artificial intelligence software that would provide purported trading "signals."

164. The Platform Defendants, directly or indirectly, also made materially false and misleading statements and omissions and engaged in deceptive conduct concerning, among other things, the purported: (1) trading on their platforms; and (2) profits generated by investors.

165. A reasonable investor would consider the misrepresented statements and false information described herein important in deciding whether or not to purchase the securities.

166. The untrue statements of material fact and misleading statements described herein were made in the offer or sale of securities.

167. The untrue statements of material fact and misleading statements described herein were made in connection with the purchase or sale of securities.

168. The Platform Defendants obtained money or property by means of the untrue statements of material fact and misleading statements described herein.

169. In connection with the conduct described herein, Defendants acted knowingly or recklessly.

170. Defendants knew or were reckless in not knowing that they were making material misrepresentations and otherwise engaging in deceptive conduct.

## FIRST CLAIM FOR RELIEF
### (Violations of Section 17(a) of the Securities Act)

171. The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 170, inclusive, as if they were fully set forth herein.

172. By engaging in the conduct described above, the Platform Defendants, directly or indirectly, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

      a.     knowingly or recklessly employed devices, schemes, or artifices to defraud;

      b.     knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

25

    c.    knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

173.    By engaging in the conduct described above, the Club Defendants, directly or indirectly, in the offer or sale of securities and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails:

    a.    knowingly or recklessly employed devices, schemes, or artifices to defraud; and/or

    b.    knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

174.    By engaging in the foregoing conduct, the Platform Defendants violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and the Club Defendants violated and, unless enjoined, will continue to violate Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## SECOND CLAIM FOR RELIEF
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)

175.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 170, inclusive, as if they were fully set forth herein.

176.    By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentalities of interstate commerce or of the mails or of any facility of a national securities exchange:

    a.    employed devices, schemes, or artifices to defraud;

b.      made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

c.      engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

177.    By engaging in the foregoing conduct, Defendants violated and, unless enjoined, will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

## **I.**

Permanently restraining and enjoining the Platform Defendants from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and the Club Defendants from, directly or indirectly, violating Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by committing or engaging in specified actions or activities relevant to such violations;

## II.

Ordering the Platform Defendants to disgorge all ill-gotten gains derived from the activities set forth in this Complaint, together with prejudgment interest thereon, pursuant to Section 21(d)(3), (5) and (7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), (5) and (7)];

## III.

Ordering Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and/or Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78(u)(d)(3)]; and

## IV.

Granting such other and further relief as this Court may deem just, equitable, or necessary in connection with the enforcement of the federal securities laws and for the protection of investors.

## <u>JURY DEMAND</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission requests that this case be tried to a jury.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Date:   December 22, 2025

By: *Christopher R. Kelly*

Christopher R. Kelly
Gregory R. Bockin*
Norman P. Ostrove*
U.S. SECURITIES AND EXCHANGE COMMISSION
Philadelphia Regional Office
1617 JFK Boulevard, Suite 520
Philadelphia, PA  19103
(215) 597-3741 (Kelly)
KellyCR@sec.gov

Devlin N. Su*
U.S. SECURITIES AND EXCHANGE COMMISSION
Chicago Regional Office

175 W. Jackson Blvd, Suite 1450
Chicago, IL 60604

*Attorneys for Plaintiff*

*Not admitted in the District of Colorado