**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

**Case No. 25-cv-04102-TPO**

**SECURITIES AND EXCHANGE COMMISSION,**

     Plaintiff,

**v.**

**MOROCOIN TECH CORP., et al.,**

     Defendants.

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION**
**FOR ENTRY OF DEFAULT JUDGMENTS AGAINST DEFENDANTS**

---

**TABLE OF CONTENTS**

PROCEDURAL BACKGROUND..............................................................................................2

FACTUAL BACKGROUND .................................................................................................2

STANDARD OF REVIEW ....................................................................................................9

ARGUMENT .........................................................................................................................10

    I.      The Jurisdictional Requirements Are Satisfied..........................................................11

    II.     The Complaint Establishes Defendants' Liability as to the Securities Law
           Violations .....................................................................................................................13

           A.      Defendants Offered and Sold Securities ......................................................13

           B.      Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5
                    Thereunder and Section 17(a) of the Securities Act ...................................15

                 1.      Defendants Violated the Antifraud Provisions of the Securities
                        and Exchange Acts Through Material Misstatements ...................17

                 2.      Defendants Violated the Antifraud Provisions of the Securities
                        and Exchange Acts Through Their Deceptive Actions..................19

    III.    The Court Should Impose Injunctive and Monetary Relief...................................21

           A.      The Court Should Enjoin Defendants from Violating the Securities
                    Laws.............................................................................................................21

           B.      The Platform Defendants Should Pay Disgorgement and Prejudgment
                    Interest..........................................................................................................24

           C.      Defendants Should Pay Civil Penalties ......................................................26

CONCLUSION......................................................................................................................29

## TABLE OF AUTHORITIES

**CASES**

*Aaron v. SEC*,
  446 U.S. 680 (1980) ................................................................................................17

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ...............................................................................19

*Arst v. Stifel, Nicolaus & Co.*,
  86 F.3d 973 (10th Cir. 1996) ...................................................................................20

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................15

*Bricklayers & Trowel Trades Int'l Pension Fund v. Denver Marble Co.*,
  No. 16-cv-02065-RM, 2019 WL 399228 (D. Colo. Jan. 31, 2019) ..........................9

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) ................................................................................................17

*FTC v. Skybiz.com, Inc.*,
  No. 01-cv-396, 2001 WL 1673645 (N.D. Okla. Aug. 31, 2001), *aff'd*, 57 F. App'x 374
  (10th Cir. 2003) .......................................................................................................23

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ...................................................................................18

*In re Application to Enforce Admin. of Subpoenas Duces Tecum of the SEC v. Knowles*,
  87 F.3d 413 (10th Cir. 1996) ...................................................................................11

*In re Rains*,
  946 F.2d 731 (10th Cir. 1991) ...................................................................................9

*Janus Capital Group, Inc. v. First Derivative Traders*,
  564 U.S. 135 (2011) ...........................................................................................15, 18

*K.N.J., Inc. v. Ames-Granite*,
  No. 15-cv-02009-PAB-KMT, 2017 WL 1133431 (D. Colo. March 27, 2017)........10

*Kerbs v. Fall River Indus., Inc.*,
  502 F.2d 731 (10th Cir. 1974) ..................................................................................18

*Liu v. SEC*,
  591 U.S. 71 (2020) .............................................................................................24, 25

ii

*Lorenzo v. SEC*,
  587 U.S. 71 (2019) ................................................................................................16, 19

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) ...........................................................................................18

*Malouf v. SEC*,
  933 F.3d 1248 (10th Cir. 2019) ........................................................................................16

*Marcus Food Co. v. DiPanfilo*,
  671 F.3d 1159 (10th Cir. 2011) ........................................................................................10

*McGill v. Am. Land & Expl. Co.*,
  776 F.2d 923 (10th Cir. 1985) ....................................................................................13, 14

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
  547 U.S. 71 (2006) ...........................................................................................................16

*Peay v. BellSouth Med. Assistance Plan*,
  205 F.3d 1206 (10th Cir. 2000) ........................................................................................12

*SEC v. Calvo*,
  378 F.3d 1211 (11th Cir. 2004) ........................................................................................24

*SEC v. Camarco Invs., Inc.*,
  No. 19-cv-1486, 2021 WL 5985058 (10th Cir. Dec. 16, 2021) .............................................24

*SEC v. Coddington*,
  No. 13-cv-3363-CMA-KMT, 2015 WL 1401679 (D. Colo. Mar. 23, 2015) ...........................13

*SEC v. Erwin*,
  No. 13-cv-03363-CMA-KMT, 2020 WL 7310584 (D. Colo. Dec. 11, 2020) .....................9, 10

*SEC v. e-Smart Techns., Inc.*,
  926 F. Supp. 2d 231 (D.D.C. 2013) ..................................................................................11

*SEC v. First City Fin. Corp., Ltd.*,
  890 F.2d 1215 (D.C. Cir. 1989) ........................................................................................24

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) ...........................................................................................26

*SEC v. GenAudio, Inc.*,
  32 F.4th 902 (10th Cir. 2022) .....................................................................................24, 28

*SEC v. GTF Enters., Inc.*,
  No. 10-CV-4258 (RA), 2015 WL 728159 (S.D.N.Y. Feb. 19, 2015) ....................................28

*SEC v. Haswell*,
654 F.2d 698 (10th Cir. 1981) .................................................................................................22

*SEC v. Inorganic Recycling Corp.*,
No. 99-cv-10159, 2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002) ............................................27

*SEC v. Levin*,
No. 12-cv-21917-UU, 2015 WL 11199843 (S.D. Fla. July 15, 2015) .....................................25

*SEC v. Mantria Corp.*,
No. 09-cv-02676-CMA-MJW, 2011 WL 3439348 (D. Colo. Aug. 5, 2011)............................26

*SEC v. Maxxon, Inc.*,
465 F.3d 1174 (10th Cir. 2006) .......................................................................................24, 25

*SEC v. McDuffie*,
No. 12-cv-2939, 2014 WL 4548723 (D. Colo. Sept. 15, 2014) ........................................14, 22

*SEC v. Mine Shaft Brewing LLC*,
No. 21-cv-00457-DBB-JCB, 2023 WL 6541552 (D. Utah Oct. 6, 2023)................................26

*SEC v. Pros Int'l, Inc.*,
994 F.2d 767 (10th Cir. 1993) .................................................................................................22

*SEC v. Sealife Corp.*,
375 F. Supp. 2d 1102 (D. Colo. 2005) .....................................................................................11

*SEC v. Smart*,
No. 9-cv-224-DAK, 2011 WL 2297659 (D. Utah June 8, 2011), *aff'd*, 678 F.3d 850
(10th Cir. 2012) .......................................................................................................................13

*SEC v. Solow*,
554 F. Supp. 2d 1356 (S.D. Fla. 2008).....................................................................................24

*SEC v. Van Gilde*,
No. 12-cv-02839, 2014 WL 12776388 (D. Colo. Oct. 17, 2014)............................................25

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) .................................................................................................................13

*SEC v. Warren*,
534 F.3d 1368 (11th Cir. 2008)................................................................................................25

*SEC v. Watson*,
No. 22-cv-2147-GPG-STV, 2024 WL 5505364 (D. Colo. Dec. 20, 2024).............................19

*SEC v. Williams*,
No. 14-cv-510-DAK, 2016 WL 3645158 (D. Utah June 30, 2016).........................................26

iv

*SEC v. Wolfson*,
    539 F.3d 1249 (10th Cir. 2008) ...............................................................................16

*SEC v. Youmans*,
    729 F.2d 413 (6th Cir.), *cert. denied*, 469 U.S. 1034 (1984) ..................................22

*SEC v. Zandford*,
    535 U.S. 813 (2002)  .............................................................................16, 21

*Seme v. E&H Prof'l Sec. Co., Inc.,*
    No. 08-cv-01569-RPM-KMT, 2010 WL 1553786 (D. Colo. Mar. 19, 2010).........................10

*Sharpshooter Spectrum Venture, LLC v. Consentino*,
    No. 09-cv-0150-WDM-KLM, 2011 WL 3159094 (D. Colo. July 26, 2011)..........................10

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024)  ...............................................................................22

*Tripodi v. Welch*,
    810 F.3d 761 (10th Cir. 2016) ......................................................................11

*United Hous. Found., Inc. v. Forman*,
    421 U.S. 837 (1975) ................................................................................14

*United States v. Naftalin*,
    441 U.S. 768 (1979)  .............................................................................16, 21

*United States v. RaPower-3, LLC*,
    960 F.3d 1240 (10th Cir. 2020)......................................................................24

*U.S. v. Uintah Valley Shoshone Tribe*,
    946 F.3d 1216 (10th Cir. 2020).....................................................................22

*Weinstein v. McClendon*,
    757 F.3d 1110 (10th Cir. 2014) .....................................................................17

*Williams v. Life Sav. & Loan*,
    802 F.2d 1200 (10th Cir. 1986) .....................................................................10

*Wing v. Gillis*,
    525 F. App'x 795 (10th Cir. 2013)..................................................................26

**STATUTES**

15 U.S.C. § 77b(a)(1)..................................................................................13

15 U.S.C. § 77q(a) ................................................................................1, 15, 16

v

15 U.S.C. § 77t(b)........................................................................................................21

15 U.S.C. § 77t(d)........................................................................................................27

15 U.S.C. § 77v(a) ......................................................................................................11

15 U.S.C. § 78c(a)(10)................................................................................................13

15 U.S.C. § 78j(b) .........................................................................................................1

15 U.S.C. § 78u(d) ..........................................................................................21, 24, 27

15 U.S.C. § 78aa(a)......................................................................................................11

28 U.S.C. § 1331.........................................................................................................11

C.R.S. § 7-90-704(2)(c) (2026)...................................................................................12

**RULES**

Fed. R. Civ. P. 55(b)(2).................................................................................................9

**REGULATIONS**

17 C.F.R. § 201.1001(b) ..............................................................................................27

17 C.F.R. § 240.10b-5 ......................................................................................1, 15, 16

**OTHER AUTHORITY**

2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4] (4th ed. 2002).....19

Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and
Exchange Commission (as of Jan. 15, 2025), available at https://www.sec.gov/enforce/civil-
penalties-inflation-adjustments..................................................................................27

Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i (Am. L. Inst. 2011)........24

The Securities and Exchange Commission (the "SEC") respectfully submits this Memorandum of Law in support of its Motion for Entry of Default Judgments against Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2). Given that defendants Morocoin Tech Corp. ("Morocoin"), Berge Blockchain Technology Co., Ltd. ("Berge"), Cirkor Inc. ("Cirkor"), AI Wealth Inc. ("AI Wealth"), Lane Wealth Inc. ("Lane Wealth"), AI Investment Education Foundation Ltd. ("AIIEF"), and Zenith Asset Tech Foundation ("Zenith" and, collectively, "Defendants") have defaulted, the Complaint's allegations are deemed admitted and establish that Defendants are liable for securities and offering fraud in this case. The SEC now respectfully moves for entry of default final judgments: (1) permanently restraining and enjoining Morocoin, Berge, and Cirkor (the "Platform Defendants") from, directly or indirectly, violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by committing or engaging in specified actions or activities relevant to such violations; (2) permanently restraining and enjoining AI Wealth, Lane Wealth, AIIEF, and Zenith (the "Club Defendants") from, directly or indirectly, violating Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], by committing or engaging in specified actions or activities relevant to such violations; and (3) ordering the following monetary relief:

| Defendant | Disgorgement | Prejudgment Interest | Civil Penalties |
|---|---|---|---|
| Morocoin | $9,640,351 | $1,075,321 | $9,640,351 |
| AI Wealth | | | $6,584,333 |
| Lane Wealth | | | $3,056,018 |
| Berge | $680,729 | $46,549 | $680,729 |
| AIIEF | | | $680,729 |
| Cirkor | $3,719,632 | $254,333 | $3,719,632 |
| Zenith | | | $3,719,632 |

## PROCEDURAL BACKGROUND

On December 22, 2025, the SEC filed its Complaint alleging that Defendants violated the antifraud provisions of the Securities and Exchange Acts. ECF 1. By January 28, 2026, the SEC perfected service of the Summons and Complaint on all Defendants. ECF 7-13. As a result, Defendants were required to answer or otherwise respond to the Complaint on or before February 18, 2026, at the latest. ECF 14-20. Defendants have failed to answer, respond, or otherwise appear in this action. ECF 14-20. Accordingly, the Clerk entered a default against each Defendant on March 4, 2026. ECF 21-27.

## FACTUAL BACKGROUND[1]

**Defendants Defrauded Investors Through a Coordinated Investment Confidence Scam**

This case involves an investment confidence scam in which Defendants lured retail investors to purported crypto asset trading platforms claiming to hold regulatory licenses, including from the Commission; gained investors' confidence with purportedly AI-generated investment "signals" or tips; manipulated investors into investing in fictitious "Security Token Offerings" ("STOs"); and caused investors to pay fraudulent withdrawal fees by telling them

---

[1]    As noted, the allegations in the SEC's Complaint are taken as true given that a default has been entered against each Defendant. Although the Complaint contains additional allegations supporting the SEC's claims, this background provides a summary recitation of the facts supporting the requested relief.

their accounts would be frozen. ECF 1 ¶ 1. Notwithstanding what the investors were led to believe by Defendants, investors' assets were never invested as Defendants represented they would be but instead were misappropriated from the start. *Id*. ¶ 5. Defendants further defrauded victims who attempted to withdraw money by demanding that they pay advance fees in order to gain access to any purported funds in their accounts. *Id*. All told, from at least January 2024 to January 2025, Defendants acted in concert to misappropriate at least $14 million from U.S.-based retail investors, which was then funneled overseas through a web of bank accounts and crypto asset wallets. *Id*. ¶ 6.

### The Club Defendants Solicited Investors to Join Clubs Promising Trading Profits from AI-Generated "Signals"

Beginning in or around January 2024, agents acting on behalf of the Club Defendants solicited U.S.-based investors through social media ads to join each respective investment club—which were essentially no more than WhatsApp groups that provided purported investment recommendations from purportedly experienced financial professionals. *Id*. ¶ 18. Some of the social media ads featured deepfake videos of prominent financial professionals. *Id*.

At all times, each of the Club Defendants acted by and through its agents. *Id*. ¶ 23. This included, for each club, a purported "professor" who sent updates to investors via WhatsApp on macroeconomic conditions or commentary on stocks and an "assistant" who handled day-to-day interactions with participants. *Id*. ¶ 24. The professors and assistants who led the clubs also sent via WhatsApp trade recommendations that they falsely claimed were based on AI-generated "signals." *Id*. ¶ 25. Some participants in the investment clubs posted screenshots of purportedly successful trades, praising the accuracy of the trading signals. *Id*. ¶ 26. At least some of the

3

screenshots of these purportedly successful trades appear to have been posted by scheme participants as a part of the scheme. *Id*.

### The Club Defendants Directed Investors to Trade Crypto Assets on the Platform Defendants' Platforms

As the next step in the scheme, Club Defendants promoted crypto asset trading and directed the victims to open accounts on the crypto asset trading platforms of Morocoin, Berge, and Cirkor. *Id*. ¶ 27. Professors and assistants in the AI Wealth and Lane Wealth clubs directed investors to the Morocoin platform, the professor and assistant in the AIIEF club directed investors to the Berge platform, and the professor and assistant in the Zenith club directed investors to the Cirkor platform. *Id*. ¶¶ 28-30. Each platform provided investors with an interface that mimicked the features and functionality of a legitimate crypto asset trading platform, including displaying real-time price information for various crypto assets, facilitating purported transactions, and posting investor account balances. *Id*. ¶ 33.

### Defendants Made False Claims About the Platforms' Regulatory Registrations and Security Features

Defendants advertised the Platform Defendants' corporate and regulatory registrations and supposed security features. *Id*. ¶ 34. In particular, Defendants made claims about the platforms' Financial Crimes Enforcement Network Money Services Business ("MSB") registrations, and regulatory licenses obtained from the Commission and the National Futures Association ("NFA"). *Id*. ¶ 35. In reality, the Platform Defendants did not hold Commission or NFA licenses, and their MSB and corporate registrations did not mean that they were compliant or legitimate. *Id*. ¶ 39.

4

As to security measures, Morocoin's and Cirkor's websites used nearly identical language representing they had "Impeccable Security" using "cutting-edge" or "advanced Ledger Vault technology" while claiming to have "$150 million in insurance against third-party theft, insider collusion, and master seed theft." *Id*. ¶ 41. Berge's website represented that it had "state-of-the-art security measures" and "[s]trictly follow[s] industry rules." *Id*. ¶ 42. These statements about the platforms' security features were untrue because they did not exist and gave investors the false impression that any funds they deposited into the platforms would be safe. *Id*. ¶ 43.

<u>Morocoin, Berge, and Cirkor Were Not Genuine Trading<br>Platforms, and Trading Never Actually Took Place on Them</u>

Once investors opened purported trading accounts on each platform, they were directed by representatives of the platforms to fund their accounts with either fiat currency or crypto assets. *Id*. ¶ 44. The Platform Defendants posted purported trading profits and losses in the investors' accounts as if the platforms were, in fact, genuine trading platforms. *Id*. ¶ 51. They were not, however, because trading never actually took place on the platforms. *Id*. The purported crypto assets investors supposedly were trading did not exist outside of this scheme. *Id*. ¶ 52.

**Defendants Promoted and Offered Fake STOs**

Whether investors made or lost money in the purported trading, the professors and assistants acting on behalf of the Club Defendants and agents of the Platform Defendants promoted fake "Security Token Offerings" or "STOs" of new crypto assets available on the platforms. *Id*. ¶ 54. The Club Defendants and Platform Defendants promoted STOs purportedly issued by legitimate businesses and equated them to initial public offerings of stock. *Id*. ¶ 56. Defendants represented that the STOs were the best way investors could either earn greater

5

profits or make back losses. *Id.* ¶ 57. Investors' funding their accounts to participate in the STOs and their payment of advance fees led to the majority of the losses in this scheme. *Id.* ¶ 60.

NNET

Beginning in May 2024, professors and assistants in the AI Wealth and Lane Wealth WhatsApp groups, and scheme participants acting as agents on behalf of Morocoin, promoted an STO of a crypto asset called NNET purportedly issued by a company called NeuralNet. *Id.* ¶ 61. They directed investors to a now-defunct website that represented that NeuralNet was developing a "brain-computer interface and humanoid robot technology" and would "combine[] advanced neuroscience, artificial intelligence and robotics" to "create an efficient and intelligent way of human-computer interaction to improve people's quality of life and promote scientific and technological progress." *Id.* ¶ 62. NeuralNet and NNET were both fictitious, and the profits that victims thought they had obtained from NNET's purported STO were not real. *Id.* ¶ 77.

SCT

In late May and June 2024, professors and assistants in the AI Wealth and Lane Wealth WhatsApp groups, and scheme participants acting as agents on behalf of Morocoin, promoted an STO of a crypto asset called SCT purportedly issued by the company SatCommTech. *Id.* ¶ 79. Defendants directed investors to a now-defunct website that represented that SatCommTech's "core goal" was "to build a secure, reliable and efficient decentralized communication network" using "blockchain technology and low-orbit satellites" to "significantly improve[] the security, stability and efficiency of communication." *Id.* ¶ 80. SatCommTech and SCT were both fictitious, and the profits that victims thought they had obtained from SCT's purported STO were not real. *Id.* ¶ 97.

6

<u>HMB</u>

In December 2024, the professors and assistants in the AIIEF and Zenith WhatsApp groups, and scheme participants acting as agents on behalf of Berge and Cirkor, promoted an STO of a crypto asset called HMB purportedly issued by another fictitious company, HumanBlock. *Id*. ¶ 99. They directed investors to a now-defunct website that represented that HumanBlock was "develop[ing] a sophisticated humanoid robot platform that leverages the decentralized, secure, and transparent nature of blockchain technology." *Id*. ¶ 100. The website represented that HumanBlock's management team had "years of experience in the robotics and automatic industry" and "a proven track record of building scalable and secure distributed systems." *Id*. ¶ 101. HumanBlock and HMB were both fictitious, and the profits that victims thought they had obtained from HMB's purported STO were not real. *Id*. ¶ 117.

**Defendants Increased Investor Losses by
Charging Fees for Withdrawals They Never Granted**

Following the purported success of the STO investments, Defendants charged investors who attempted to withdraw their trading profits advance fees that caused the investors further losses. *Id*. ¶ 119. In an attempt to make a withdrawal from their trading accounts, certain investors repaid their purported loans, including by transferring money directly to overseas accounts or by arranging a courier to pick up cash. *Id*. ¶ 127. Investors who repaid these purported loans still were not permitted by Defendants to withdraw any funds. *Id*. ¶ 128.

Defendants also solicited fraudulent advance fees based on claims of fictitious government investigations. *Id*. ¶ 129. AIIEF, Zenith, Berge, and Cirkor told investors that they could expedite their withdrawals by paying fees using money from outside their trading accounts. *Id*. ¶ 135. As with the loans, certain investors paid the fees, but none was able to

withdraw their money. *Id*. ¶ 136. Eventually, the Platform Defendants cut off investors from the platforms. *Id*. ¶ 137.

**Defendants Misappropriated Investor Funds**

This was an elaborate confidence scam to misappropriate as much in crypto assets and fiat currency as Defendants could from their victims. *Id*. ¶ 139. No trading occurred on the Morocoin, Berge, or Cirkor platforms, and the STOs and their issuing companies never existed. *Id*. ¶ 140. The trading profits investors thought they earned were fictitious, and their original investment amounts were long since transferred overseas. *Id*. ¶ 141.

Misappropriation of Crypto Assets

The following chart summarizes losses of U.S.-based investors in crypto assets used to fund their purported trading accounts and pay associated advance fees:

| Defendant Pairings | Investors | Traced Crypto Asset Losses |
|---|---|---|
| Morocoin | 27 | $5,520,032 |
| *AI Wealth Subtotal* | *14* | *$2,990,414* |
| *Lane Wealth Subtotal* | *13* | *$2,529,618* |
| Berge and AIIEF | 9 | $254,729 |
| Cirkor and Zenith | 21 | $1,632,376 |
| **Total** | **57** | **$7,407,137** |

*Id*. ¶ 145; Pl. Ex. 1 (Bedkowski Decl.) ¶ 8.

Misappropriation of Fiat Currency

The following chart summarizes losses of U.S.-based investors in fiat currency used to fund their purported trading accounts and pay associated advance fees:

| Defendant Pairings | Investors | Traced Fiat Losses |
|---|---|---|
| Morocoin | 12 | $4,120,319 |
| *AI Wealth Subtotal* | *10* | *$3,593,919* |
| *Lane Wealth Subtotal* | *2* | *$526,400* |
| Berge and AIIEF | 4 | $426,000 |
| Cirkor and Zenith | 10 | $2,087,256 |
| **Total** | **26** | **$6,633,575** |

*Id*. ¶ 153; Pl. Ex. 2 (Boodoo Decl.) ¶ 3.

## **STANDARD OF REVIEW**

Under Tenth Circuit law:

[D]efault judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party. In that instance, the diligent party must be protected lest he be faced with interminable delay and continued uncertainty as to his rights. The default judgment remedy serves as such a protection.

*In re Rains*, 946 F.2d 731, 732-33 (10th Cir. 1991) (citation and quotation marks omitted). "A default amounts to an admission of liability, and all well-pleaded allegations in the complaint pertaining to liability are deemed true." *SEC v. Erwin*, No. 13-cv-03363-CMA-KMT, 2020 WL 7310584, at *1 (D. Colo. Dec. 11, 2020). "The Court also accepts as undisputed any facts set forth by the moving party in affidavits and exhibits." *Bricklayers & Trowel Trades Int'l Pension Fund v. Denver Marble Co*., No. 16-cv-02065-RM, 2019 WL 399228, at *2 (D. Colo. Jan. 31, 2019).

Where a plaintiff's claim is not for a sum certain or a sum that can be made certain by computation, after the Clerk has entered default, the plaintiff must apply to the court for a default judgment.[2] Fed. R. Civ. P. 55(b)(2). It "remains for the court to consider whether the

---

[2]    Although, as reflected herein, the amount of ill-gotten gains subject to disgorgement "can be made certain by computation," other equitable relief and civil penalty amounts

unchallenged facts constitute a legitimate cause of action, since a party in default does not admit conclusions of law." *Erwin*, 2020 WL 7310584, at *1 (citation and quotation marks omitted). "In the context of a default judgment, a plaintiff 'must . . . establish that on the law it is entitled to the relief it requests, given the facts as established by the default.'" *Id.* (citation omitted). "When 'ruling on a motion for default judgment, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment.'" *K.N.J., Inc. v. Ames-Granite*, No. 15-cv-02009-PAB-KMT, 2017 WL 1133431, at *2 (D. Colo. March 27, 2017) (quoting *Seme v. E&H Prof'l Sec. Co., Inc.*, No. 08-cv-01569-RPM-KMT, 2010 WL 1553786, at *11 (D. Colo. Mar. 19, 2010)).

## ARGUMENT

Following entry of default, courts follow two steps before granting default judgment. First, a court "must determine whether it has jurisdiction." *Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1169 (10th Cir. 2011) (citation omitted). Defects in personal jurisdiction are not waived by default when a party fails to appear or to respond. *See Williams v. Life Sav. & Loan*, 802 F.2d 1200, 1202-03 (10th Cir. 1986). "[W]here, as here, the issue is determined on the basis of the pleadings and affidavits, that burden may be met by a *prima facie* showing." *Sharpshooter Spectrum Venture, LLC v. Consentino*, No. 09-cv-0150-WDM-KLM, 2011 WL 3159094, at *2 (D. Colo. July 26, 2011) (citation omitted).

---

requested herein cannot, and thus the SEC requests that the Court enter judgments against Defendants pursuant to Federal Rule of Civil Procedure 55(b)(2).

10

Second, courts must consider whether the well-pleaded allegations of fact—which are admitted by a defendant upon default—support a judgment on the claims. *See Tripodi v. Welch*, 810 F.3d 761, 764-65 (10th Cir. 2016).

## I.    The Jurisdictional Requirements Are Satisfied

This Court has subject matter jurisdiction of this case, personal jurisdiction over Defendants, and service of process was proper.

The SEC asserts violations of the antifraud provisions of the Securities Act and Exchange Act. ECF 1 ¶¶ 171-77. Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. § 1331 because the SEC's claims arise under federal law.

This Court also has personal jurisdiction over Defendants given the broad nationwide personal jurisdiction afforded under the Securities and Exchange Acts, as well as the connections between Defendants' fraudulent scheme and Colorado. These "statutes provide for very broad service of process." *SEC v. e-Smart Techns., Inc.*, 926 F. Supp. 2d 231, 236 (D.D.C. 2013) (citing 15 U.S.C. § 78aa(a) ("process ... may be served in any other district of which the defendant is an inhabitant or *wherever the defendant may be found*")); 15 U.S.C. § 77v(a) (same)). As a result, where, like here, personal jurisdiction is based upon a federal statute providing for nationwide or worldwide service, "the relevant inquiry is whether the respondent has had sufficient minimum contacts with **the United States**. Specific contacts with the district in which enforcement is sought, in this case Colorado, are unnecessary." *In re Application to Enforce Admin. of Subpoenas Duces Tecum of the SEC v. Knowles*, 87 F.3d 413, 417 (10th Cir. 1996) (emphasis added and citations omitted); *see also SEC v. Sealife Corp.*, 375 F. Supp. 2d 1102, 1104 (D. Colo. 2005) ("When a federal statute authorizes service of process, the defendant

11

has the burden of showing that the exercise of jurisdiction in the chosen forum will be so inconvenient as to rise to a level of constitutional concern. Only in 'highly unusual cases' will inconvenience to the defendant rise to that level.") (citing *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1210, 1212 (10th Cir. 2000)). Defendants all reside in the United States, ECF 1 ¶¶ 11-17, and thus have sufficient contacts to be subject to personal jurisdiction.

Moreover, Morocoin, Berge, AIIEF, and Zenith are all "found in" and "inhabit[]" this District, ECF 1 ¶¶ 11, 12, 16, and 17, and AI Wealth, Lane Wealth, and Cirkor each coordinated with these Colorado entities to accomplish their fraudulent scheme. *See*, *e.g.*, *id.* ¶ 28 ("Professors and assistants in the AI Wealth and Lane Wealth clubs directed investors to the Morocoin platform."); *id.* ¶ 30 ("The professor and assistant in the Zenith club directed investors to the Cirkor platform."). Specifically, AI Wealth and Lane Wealth directed their victims to Colorado-registered Morocoin, and Cirkor relied upon referrals from Colorado-registered Zenith to obtain its victims. Indeed, two residents of Colorado are among the victims. Pl. Ex. 2 (Boodoo Decl.) ¶ 5. As a result, the Court has personal jurisdiction over Defendants.

Finally, service of process on Defendants was proper here. Cirkor was served via its registered agent. ECF 9. Because the respective registered agents of the remaining Defendants were not located under their registered agent names at their registered agent addresses, Morocoin, Berge, AI Wealth, Lane Wealth, AIIEF, and Zenith were each served pursuant to Rules 4(e)(1) and 4(h)(1)(A) of the Federal Rules of Civil Procedure and Section 7-90-704(2)(c) of the Colorado Revised Statutes by sending the Summons and Complaint via certified mail, return receipt requested, addressed to each such Defendant's principal address. ECF 7-8, 10-13.

## II.     The Complaint Establishes Defendants' Liability as to the Securities Law Violations

The Complaint alleges facts, deemed admitted, that establish Defendants' liability with respect to the securities law violations.

### A.     Defendants Offered and Sold Securities

Section 3(a)(10) of the Exchange Act and Section 2(a)(1) of the Securities Act specifically define a security to include, among other things, any "investment contract." 15 U.S.C. § 78c(a)(10); 15 U.S.C. § 77b(a)(1). An investment contract exists where there is: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits to be derived from the efforts of others. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946). Moreover, the federal securities laws apply even if the investment being offered and sold to investors does not in fact exist. "All that is required is that an investor would reasonably believe that they are investing in securities." *SEC v. Smart*, No. 9-cv-224-DAK, 2011 WL 2297659, at *17 (D. Utah June 8, 2011), *aff'd*, 678 F.3d 850 (10th Cir. 2012); *SEC v. Coddington*, No. 13-cv-3363-CMA-KMT, 2015 WL 1401679, at *1 (D. Colo. Mar. 23, 2015) (denying motion to dismiss securities fraud allegations that defendants induced investments in a trading program that did not exist). The facts and circumstances of the STOs here satisfy the *Howey* factors.

First, investors here made their investments using money in the form of fiat currency or crypto assets. ECF 1 ¶¶ 67, 86, 107. As a result, the first prong of *Howey* has been satisfied.

Second, the investments were made in a common enterprise. *Id.* ¶¶ 68, 87, 108. In assessing commonality, the Tenth Circuit looks to the general "economic reality" of the transaction; neither vertical nor horizontal commonality is required. *McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 925-26 (10th Cir. 1985). In other words, "a transaction [that] is in reality an

13

investment (that is, a transaction of a type in which stock is often given)" creates a common enterprise. *Id*. at 925. The economic reality of the STO offerings here demonstrates commonality. As an initial matter, the offerings were expressly and repeatedly compared to "initial public offerings of stock," ECF 1 ¶¶ 56, 58, which, of course, are "a transaction of a type in which stock is often given." *McGill*, 776 F.2d at 925. Additionally, investors for each investment were provided information about the goals, plans, and roadmaps for execution of each project. ECF 1 ¶¶ 62, 80-82, 100-02. Investors therefore reasonably understood that the purported investment proceeds were being pooled by the fictitious issuers and used for the purported common enterprise of funding their respective businesses. *Id*. ¶¶ 68, 87, 108. The websites and whitepaper also described a certain percentage of tokens being allocated to STO participants, further indicating that investors were investing in a common enterprise. *Id*. ¶¶ 65, 84, 104. Similarly, the tokens were described as having a significant portion retained by each company supposedly issuing the STO, indicating that the investors' financial fortunes supposedly rose or fell equally with the success of the respective businesses. *Id*. ¶¶ 64, 84, 104-05. *See, e.g., SEC v. McDuffie*, No. 12-cv-2939, 2014 WL 4548723, at *6 (D. Colo. Sept. 15, 2014) (reasoning that the determining factor of a common enterprise and the economic reality of the transaction is whether the investment was for profit). This satisfies the second prong of the *Howey* test.

Finally, investors had "a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 852 (1975); ECF 1 ¶¶ 74, 90, 113. Investors expected—based on promotions on the Platform Defendants' websites, the WhatsApp chats from the Club Defendants, and the fictitious

companies' websites and whitepaper to which Defendants directed investors—that the issuers had expert teams that would develop the neural interface, satellite, and robot projects, and that investors would enjoy astounding returns based on the success of the companies. ECF 1 ¶¶ 69-73, 88-89, 109-12. Furthermore, these were passive investments; investors had no roles in the issuers' purported endeavors. *Id.* ¶ 157. Thus, the third prong of *Howey* has been satisfied.

Accordingly, the STO investments in NNET, SCT, and HMB underpinning this fraudulent scheme were offered and sold subject to investment contracts and are thus securities under the Securities Act and Exchange Act.

**B.      Defendants Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder and Section 17(a) of the Securities Act**

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder prohibit "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," in connection with the purchase or sale of a security. 17 C.F.R. § 240.10b-5(b). "For purposes of Rule 10b-5(b), the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). Section 17(a)(2) of the Securities Act is similar and prohibits, in the offer or sale of a security, "obtain[ing] money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77q(a)(2). Materiality is satisfied if a reasonable investor would have viewed disclosure as significantly altering the total mix of information available. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder prohibit employing "any device, scheme, or artifice to defraud" or engaging in any "act, practice, or course of business" which operates or would operate as a fraud or deceit on any person, in connection with the purchase or sale of a security. 17 C.F.R. §§ 240.10b-5(a), (c). Sections 17(a)(1) and (a)(3) of the Securities Act prohibit, in the offer or sale of a security, employing "any device, scheme, or artifice to defraud" or engaging in any "transaction, practice, or course of business" which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. §§ 77q(a)(1), (3). The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Although these provisions require that a defendant be a "maker" or obtain money or property "by means of" a particular statement or omission, there is considerable overlap among them and the same conduct can establish a violation of multiple subsections of Rule 10b-5 and/or Section 17(a). *Id*. at 79-82; *see also Malouf v. SEC*, 933 F.3d 1248, 1260 (10th Cir. 2019) (holding that *Lorenzo*, which was decided under Rule 10b-5, also governs the interpretation of the subsections of Section 17(a)).

Under these provisions, the fraudulent conduct must occur "in connection with" the purchase or sale of securities for violations of Rule 10b-5, 17 C.F.R. § 240.10b-5, and "in the offer or sale" of securities for violations of Section 17(a). 15 U.S.C. § 77q(a). Both requirements have been construed broadly. *See, e.g., United States v. Naftalin*, 441 U.S. 768, 773 n.4, 778 (1979); *SEC v. Zandford*, 535 U.S. 813, 819-21 (2002); *SEC v. Wolfson*, 539 F.3d 1249, 1262 (10th Cir. 2008). With respect to Rule 10b-5's "in connection with" requirement, for instance, it is sufficient that the fraud alleged "coincide" with the securities transaction. *Id.* (citing *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 85 (2006)).

16

Finally, proof of scienter is required for Section 17(a)(1) and Section 10(b) and Rule 10b-5 thereunder, whereas negligence is sufficient for Sections 17(a)(2) and 17(a)(3). *See Aaron v. SEC*, 446 U.S. 680, 691, 697 (1980). Scienter has been defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). Recklessness is sufficient to establish scienter "by the defendant's knowledge of a fact that was so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors." *Weinstein v. McClendon*, 757 F.3d 1110, 1113 (10th Cir. 2014) (citation omitted).

1. **Defendants Violated the Antifraud Provisions of the Securities and Exchange Acts Through Material Misstatements**

Defendants made numerous material misstatements to the investors they defrauded, including by falsely telling investors:

- That the Club Defendants had access to specialized AI trading software capable of predicting extraordinary returns, ECF 1 ¶ 25;

- That the Platform Defendants held "regulatory licenses" from the SEC (Cirkor), *id*. ¶ 37; featured "Impeccable Security" (Morocoin and Cirkor), *id*. ¶ 32; and had "state-of-the-art security measures" and "[s]trictly follow[ed] industry rules" (Berge), *id*. ¶ 42;

- That NeuralNet, SatCommTech, and HumanBlock, in fact, existed, *id*. ¶¶ 63, 83, 103;

- That NNET, SCT, and HMB, in fact, existed and could be purchased in an STO, *id*. ¶¶ 54, 56, 77, 97, 117;

- That their accounts held certain balances, including the supposed profits made on the fake STOs, *id*. ¶¶ 77, 97, 117; and

- That investors were required to pay various fees in order to withdraw their money from the trading platforms, *id*. ¶¶ 122-38.

17

These misstatements were material: a reasonable investor would have wanted to know that these statements were false, and that this was a fraudulent scheme to misappropriate money from investors here in the United States. *Id*. ¶ 165.

Defendants were the makers of these misstatements under *Janus*. "[I]n the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." *Janus*, 564 U.S. at 142-43. False statements about the safety of customer assets on the platforms, customers' purported account balances, and details about the STO offerings appeared on the platforms' websites and thus are attributable to the Platform Defendants. Similarly, WhatsApp groups run by the Club Defendants made false statements about their specialized AI trading software, the regulatory licenses and compliance of the supposed trading platforms, and the existence of the STOs. Because a company "is liable for the fraud and misrepresentations of [its] agent while acting within the scope of his authority or employment," *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 741 (10th Cir. 1974) (*abrogated on other grounds*), Defendants were the makers of those misstatements under traditional agency principles as well. *See*, *e.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 426 (7th Cir. 2015) ("Nothing in *Janus* undid the long-standing rule that '[a] corporation is liable for statements by employees who have apparent authority to make them.'" (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008))).

Furthermore, these misstatements were made in connection with the purchase or sale, and in the offer or sale, of securities. ECF 1 ¶¶ 166-67. They were designed to convince, and

18

succeeded in convincing, the victims to invest heavily in the fake STOs to maximize the Platform Defendants' ill-gotten gains from this scheme.

Finally, Defendants made these statements either knowingly or recklessly, and thus with scienter. *See*, *e.g., id.* ¶¶ 169-70. To establish that a corporation acted with scienter, the culpable acts of an agent of the corporation can be imputable to the corporation. *See*, *e.g.*, *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106-07 (10th Cir. 2003) (citing 2 Thomas Lee Hazen, *Treatise on the Law of Securities Regulation* § 12.8[4], at 444 (4th ed. 2002) ("[K]nowledge of a corporate officer or agent acting within the scope of authority is attributable to the corporation.")). Accordingly, the many lies by Defendants' agents described above are imputable to Defendants.

Accordingly, Defendants violated Section 10(b) and Rule 10b-5(b) by making false and misleading statements of material facts in connection with the purchase or sale of securities. ECF 1 ¶¶ 162-64. Additionally, because the Platform Defendants obtained money or property based on false and misleading statements in the offer or sale of a security, *id.* ¶ 168, they also violated Section 17(a)(2).

### 2. Defendants Violated the Antifraud Provisions of the Securities and Exchange Acts Through Their Deceptive Actions

Defendants also employed a "device, scheme, or artifice to defraud," in violation of Rule 10b-5(a) and Section 17(a)(1), and engaged in a transaction, act, practice, or course of business that operated as a fraud or deceit on investors in violation of Rule 10b-5(c) and Section 17(a)(3). *See SEC v. Watson*, No. 22-cv-2147-GPG-STV, 2024 WL 5505364, at *5 (D. Colo. Dec. 20, 2024); *see also Lorenzo*, 587 U.S. at 79-80 (knowing dissemination of misrepresentations with an intent to deceive violates Rules 10b-5(a) and (c) and Section 17(a)(1)). Defendants here

19

engaged in numerous deceptions over and above the misstatements described above sufficient to establish liability under these provisions. Indeed, Defendants' scheme consisted of an entire operation that, at its core, was fictitious and designed to defraud investors of their money. Defendants deceived investors through their use of:

- fake WhatsApp groups populated with professors and assistants promoted by deepfake videos of prominent financial professionals, ECF 1 ¶¶ 1, 5, 18, 24;

- fake trading platforms, trading activity, and account balances, *id*. ¶¶ 27, 50-52, 75-77, 95-97, 116-17;

- fake STOs from fictitious companies, *id*. ¶¶ 56, 62-63, 80-83, 100-03;

- fake loans, *id*. ¶¶ 91-94, 96, 115; and

- fake account freezes from supposed governmental investigations, *id*. ¶¶ 130, 133, 138.

Furthermore, this deceptive conduct all occurred in connection with the purchase or sale of a security, and in the offer or sale of a security. The deceptive conduct comprises fake videos, websites, identities, trading platforms, trading activity, loan documentation, and account freezes that were designed to convince, and succeeded in convincing, investors to purchase significant amounts of the fake STOs and then pay additional money to get access to their fake profits. Indeed, the pre-STO conduct was designed to boost investors' confidence in the clubs and platforms so that they would invest large amounts of money in the STOs, after which Defendants could then charge the investors advance fees to withdraw what they believed were astronomical profits from their STO investments. Accordingly, there is a causal connection between the fraudulent conduct and the offers and sales of the STOs. *See Arst v. Stifel, Nicolaus & Co.*, 86 F.3d 973, 977 (10th Cir. 1996) ("This court has construed 'in connection with' to require a causal connection between the allegedly deceptive act or omission and the alleged injury."); *see*

20

*also Zandford*, 535 U.S. at 819, 822 (construing Section 10(b) and Rule 10b-5 "flexibly to effectuate [their] remedial purposes" and holding that "[i]t is enough that the scheme to defraud and the sale of securities coincide" (quotation marks omitted));. *Naftalin*, 441 U.S. at 773 (holding that the "in the offer or sale" requirement of Section 17(a) was intended to be "define[d] broadly" and is "expansive enough to encompass the entire selling process").

Finally, Defendants engaged in this deceptive conduct with scienter. *See, e.g.,* ECF 1 ¶¶ 169-70. This entire operation was built to be a fraud. Defendants, through their agents, created a complex infrastructure—including sham WhatsApp groups offering fake investment tips, fictitious crypto-trading interfaces and STOs, and non-existent loans and investigations—all to defraud and deceive investors out of as much money as possible.

## III.    The Court Should Impose Injunctive and Monetary Relief

Because the Complaint's allegations, taken as true, demonstrate Defendants' violations of the antifraud provisions of the Securities and Exchange Acts, the Court should enter the requested default judgments against Defendants and in favor of the SEC and order the requested injunctive and monetary relief.

### A.    The Court Should Enjoin Defendants from Violating the Securities Laws

The SEC seeks final judgments permanently enjoining Defendants from future violations of the securities laws at issue here. ECF 1 ¶ 7 and Prayer For Relief I. The Securities and Exchange Acts grant the SEC authority to seek injunctive relief when it appears, upon proper showing, "that any person is engaged or is about to engage in acts or practices constituting a violation of" these laws. 15 U.S.C. §§ 77t(b), 78u(d)(1). A permanent injunction is appropriate in the event the SEC shows: "(1) actual success on the merits; (2) irreparable harm unless the

21

injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *U.S. v. Uintah Valley Shoshone Tribe*, 946 F.3d 1216, 1222 (10th Cir. 2020) (citation and quotation marks omitted); *see also Starbucks Corp. v. McKinney*, 602 U.S. 339, 346-48 (2024). These factors are met here.

First, as explained above, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act. Accordingly, the SEC has succeeded on the merits in this action.

Second, there is a likelihood of irreparable harm unless the injunctions are issued. Defendants' past violations permit "an inference that future violations will occur." *McDuffie*, 2014 WL 4548723, at *10. Moreover, the "[d]etermination of the likelihood of future violations requires analysis of several factors, such as the seriousness of the violation, the degree of scienter, whether defendant's occupation will present opportunities for future violations and whether defendant has recognized his wrongful conduct and gives sincere assurances against future violations." *SEC v. Pros Int'l, Inc.*, 994 F.2d 767, 769 (10th Cir. 1993) (citing *SEC v. Youmans*, 729 F.2d 413, 415 (6th Cir.), *cert. denied*, 469 U.S. 1034 (1984)). "Although no single factor is determinative, [the Tenth Circuit] ha[s] previously held that the degree of scienter 'bears heavily' on the decision." *Id.* (citation omitted); *see also SEC v. Haswell*, 654 F.2d 698, 699 (10th Cir. 1981) ("The presence or absence of scienter in a defendant's past conduct, even if that conduct constitutes a violation of the securities laws absent scienter, is a circumstance which bears heavily on a district court's decision to issue an injunction."). Defendants' fraudulent scheme was orchestrated to misappropriate as much as possible from their victims, and therefore

22

Defendants indisputably acted with scienter, weighing in favor of the injunctions. Additionally, Defendants' securities law violations were serious, Defendants' professed occupations (investment groups and trading platforms) were chosen to facilitate their fraudulent scheme, and Defendants have neither recognized their wrongful conduct, nor provided sincere assurances against future violations. Accordingly, there is a likelihood of future violations and irreparable harm unless the injunctions are issued.

Third, the threatened injury to the investing public outweighs any harm the injunctions would cause Defendants. "When a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *FTC v. Skybiz.com, Inc.*, No. 01-cv-396, 2001 WL 1673645, at *8 (N.D. Okla. Aug. 31, 2001), *aff'd*, 57 F. App'x 374 (10th Cir. 2003). Here, the investing public would benefit from injunctions preventing Defendants from continuing their fraudulent activities. In contrast, if the Court were to order the injunctions, the only harm to Defendants would be that they would be prohibited from future violations of the antifraud provisions of the Exchange and Securities Acts by taking certain actions that they are not legally permitted to do in any event. Balancing these interests, the threatened injury to the public in the absence of the injunctions clearly outweighs Defendants' interests in continuing to defraud United States investors.

Finally, and relatedly, the last factor is also met because barring Defendants from continuing to defraud United States investors is indisputably in the public interest.

Accordingly, the legal standard for issuing injunctions has been met, and a balancing of the equities strongly supports entry of the injunctions.

B.       **The Platform Defendants Should Pay Disgorgement and Prejudgment Interest**

The Exchange Act authorizes district courts in civil actions brought by the SEC to order "disgorgement" of "any unjust enrichment by the person who received such unjust enrichment as a result of " a violation of the Act. 15 U.S.C. §§ 78u(d)(3)(A)(ii) and (7); *see* 15 U.S.C. § 78u(d)(5). Disgorgement need only be a "reasonable approximation" of the defendant's ill-gotten gains. *SEC v. Camarco Invs., Inc.*, No. 19-cv-1486, 2021 WL 5985058, at \*14 and n.22 (10th Cir. Dec. 16, 2021); *SEC v. Maxxon, Inc.*, 465 F.3d 1174, 1179 (10th Cir. 2006). "Once a reasonable approximation is shown [by the SEC], 'the burden shifts back to the defendant[s] to 'demonstrate that the disgorgement figure [is] not a reasonable approximation.''" *SEC v. GenAudio, Inc.*, 32 F.4th 902, 945 n.22 (10th Cir. 2022) (citation omitted). Additionally, in approximating a defendant's ill-gotten gains, "[a]ny uncertainty is resolved against the 'conscious wrongdoer.'" *United States v. RaPower-3, LLC,* 960 F.3d 1240, 1252 (10th Cir. 2020) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. i (Am. L. Inst. 2011)); *SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231-32 (D.C. Cir. 1989).

Calculation of the defendant's economic gain need not be exact, and determination of the approximate amount is left to the sound discretion of the trial court. *SEC v. Solow*, 554 F. Supp. 2d 1356, 1363 (S.D. Fla. 2008) ("Exactitude is not a requirement; so long as the measure of disgorgement is reasonable, any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.") (quoting *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004)). Although the Court must "deduct legitimate expenses before ordering disgorgement," Defendants had no legitimate expenses here because their entire enterprise was a fraud designed to misappropriate as much as possible from their victims. *Liu v. SEC*, 591 U.S. 71, 91-92 (2020).

24

The SEC's plan, to the extent feasible, is to "return [the Platform Defendants'] gains to wronged investors for their benefit." *Id.* at 88. Finally, a defendant's inability to pay or financial hardship is no defense to a request for disgorgement. *SEC v. Levin*, No. 12-cv-21917-UU, 2015 WL 11199843, at *2 (S.D. Fla. July 15, 2015); *see also SEC v. Warren*, 534 F.3d 1368, 1370 n.2 (11th Cir. 2008) ("A contrary rule would allow con artists to escape disgorgement liability by spending their ill-gotten gains—an absurd result.").

Here, the Platform Defendants each obtain ill-gotten gains in the form of the fiat currency and crypto assets that they misappropriated from investors in connection with the fraudulent scheme. Specifically, Morocoin received $9,640,351 in ill-gotten gains, Berge received $680,729 in ill-gotten gains, and Cirkor received $3,719,632 in ill-gotten gains. ECF 1 ¶¶ 145, 153; Pl. Ex. 2 (Boodoo Decl.) ¶ 3; Pl. Ex. 1 (Bedkowski Decl.) ¶ 8.

But for Defendants' securities law violations, the Platform Defendants would not have received any of these funds, and therefore such funds are causally connected to the fraud and subject to disgorgement. *Maxxon*, 465 F.3d at 1179 (requiring disgorgement to be "causally connected to the violation").

The SEC also seeks prejudgment interest from Morocoin in the amount of $1,075,321, Berge in the amount of $46,549, and Cirkor in the amount of $254,353. *See* Pl. Ex. 2 (Boodoo Decl.) ¶ 4. It is within the Court's discretion to award prejudgment interest. *SEC v. Van Gilde*, No. 12-cv-02839, 2014 WL 12776388, at *4 (D. Colo. Oct. 17, 2014) ("Prejudgment interest is a matter of equitable discretion for the court and I find it is fair, reasonable and just in order to have the inside trader return the time value of the moneys he was illegally obtaining."). An award of prejudgment interest is appropriate here "[u]nder fairness and equity principles"

because such an award prevents the Platform Defendants from "effectively . . . benefit[ing] from an interest-free loan." *Wing v. Gillis*, 525 F. App'x 795, 801 (10th Cir. 2013). In deciding whether to award prejudgment interest, "[a] court should consider '(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court.'" *SEC v. Mine Shaft Brewing LLC*, No. 21-cv-00457-DBB-JCB, 2023 WL 6541552, at *13 (D. Utah Oct. 6, 2023) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996) (citation and quotation marks omitted)). "Generally, prejudgment interest is calculated at the IRS underpayment rate, which reflects the costs to the defendant had it borrowed money from the government." *SEC v. Mantria Corp.*, No. 09-cv-02676-CMA-MJW, 2011 WL 3439348, at *8 (D. Colo. Aug. 5, 2011). This is the rate and methodology that the SEC generally applied here in calculating the prejudgment interest amounts. *See* Pl. Ex. 2 (Boodoo Decl.) ¶ 4.

Here, all of the factors enumerated above support the imposition of prejudgment interest. Additionally, the remedial purpose of the statutes—namely, to protect securities investors from being defrauded—and other equitable principles favor the imposition of prejudgment interest. *Mine Shaft Brewing*, 2023 WL 6541552, at *14 ("An award of interest will thus help more fully compensate investors for their losses.").

### C.     Defendants Should Pay Civil Penalties

In SEC enforcement cases, "'[d]isgorgement alone is an insufficient remedy' because 'there is little deterrent in a rule that allows a violator to keep the profits if [he] is not detected, and requires only a return of ill-gotten gains if [he] is caught.'" *SEC v. Williams*, No. 14-cv-510-

DAK, 2016 WL 3645158, at *4 (D. Utah June 30, 2016) (citing *SEC v. Inorganic Recycling Corp.*, No. 99-cv-10159, 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002)). Accordingly, Securities Act Section 20(d) and Exchange Act Section 21(d)(3) authorize the Court to order civil monetary penalties based on Defendants' violations of the securities laws. 15 U.S.C. §§ 77t(d), 78u(d)(3).

The Court is to determine the penalty amount "in light of the facts and circumstances" based on a three-tiered penalty scheme. 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B). The highest tier of penalties—the third tier—is appropriate here because the violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," and the violations "directly or indirectly resulted in substantial losses." 15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B).

Pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, the maximum third-tier civil penalties are the greater of: (i) the statutory maximum multiplied on a per-violation basis; or (ii) the gross amount of pecuniary gain to the defendant. 15 U.S.C. §§ 77t(d), 78u(d)(3). The statutory per-violation maximum third-tier penalty amount, adjusted for inflations, is $1,182,251. 17 C.F.R. § 201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of Jan. 15, 2025), available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments. Courts have wide discretion in determining the penalty to be assessed, and consider the following factors:

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and

27

future financial condition.

*GenAudio Inc.*, 32 F. 4th at 954 (citation omitted).

Here, Defendants' conduct was egregious; they acted with a high degree of scienter; their conduct was repeated; they failed to admit any wrongdoing; their conduct caused substantial losses; Defendants have not cooperated in the underlying investigation of this matter;[3] and there are no circumstances here that would justify reducing the penalties as a result of Defendants' financial condition (especially given Defendants' refusal to even appear in this case).

As a result, the SEC respectfully requests that the Court order the Platform Defendants to pay civil penalties in the amounts of their gross amount of their pecuniary gain from their scheme, resulting in civil penalties of: (1) $9,640,351 as to Morocoin; (2) $680,729 as to Berge; and (3) $3,719,632 as to Cirkor.

As for the Club Defendants, because they did not personally receive pecuniary gains, their maximum civil penalty amounts are calculated by multiplying the statutory maximum amount—which, again, is $1,182,251—by the number of violations committed. There are a number of ways in which the Court may count the number of violations committed, which includes the number of investors defrauded or the number of fraudulent transactions. *SEC v. GTF Enters., Inc.*, No. 10-CV-4258 (RA), 2015 WL 728159, at *4 (S.D.N.Y. Feb. 19, 2015) (citation omitted) ("The Court may, for instance, look to the number of investors defrauded or the number of fraudulent transactions to determine the number of violations."). The SEC submits that the appropriate civil penalty amounts as to the Club Defendants should be proportional to the civil

---

[3] Although the SEC subpoenaed Defendants for documents in connection with its investigation, Defendants failed to provide any documents or otherwise respond. Pl. Ex. 2 (Boodoo Decl.) ¶ 6.

28

penalties of the Platform Defendants, as well as the Club Defendants' overall role in this fraudulent scheme. To that end, the SEC respectfully requests that the Court order civil penalty amounts against the Club Defendants equal to the investor losses that they respectively caused by directing victims to the trading platforms, resulting in civil penalties of: (1) $6,584,333 for AI Wealth; (2) $3,056,018 for Lane Wealth; (3) $680,729 for AIIEF; and (4) $3,719,632 for Zenith. Even using the more conservative number of victims defrauded in determining the number of violations, the SEC's proposed civil penalties against the Club Defendants comfortably fall within the statutory maximums given that at least: (1) 21 investors were defrauded by AI Wealth; (2) 15 investors were defrauded by Lane Wealth; (3) 12 investors were defrauded by AIIEF; and (4) 26 investors were defrauded by Zenith. Pl. Ex. 1 (Bedkowski Decl.) ¶ 9.

## CONCLUSION

For the foregoing reasons, the Court should order entry of final default judgments against Defendants and order the relief requested herein.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

Date:   April 14, 2026          By: s/ Christopher R. Kelly
                                Christopher R. Kelly
                                U.S. SECURITIES AND EXCHANGE COMMISSION
                                Philadelphia Regional Office
                                1617 JFK Boulevard, Suite 520
                                Philadelphia, PA  19103
                                (215) 597-3741
                                KellyCR@sec.gov

                                *Attorney for Plaintiff Securities and Exchange Commission*

29